IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERMANE STUART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:06-cv-1000 |
| ) | Judge Trauger |
| METROPOLITAN GOVERNMENT OF ) | |
| NASHVILLE AND DAVIDSON COUNTY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court are the defendant's Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b), or, in the Alternative, Motion for a New Trial Pursuant to Fed. R. Civ. P. 59 (Docket No. 140), the plaintiff's Motion for Attorney Fees (Docket No. 143), and the defendant's Motion for Review [of Clerk's Taxation of Costs] (Docket No. 150). For the reasons discussed herein, the defendant's motions will be denied, and the plaintiff's motion will be granted.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Shermane Stuart, is an African-American female firefighter employed by Metro's Nashville Fire Department (NFD).[1] After Stuart was hired by Metro in 2004, she attended the training Academy and participated in the new-hire rotational program, whereby she rotated through various fire stations in Nashville, before she received a permanent assignment

---

[1] The facts, as discussed herein, are largely drawn from the court's memory of and notes from the trial, as confirmed by the facts as discussed in the parties' post-trial briefing.

1

with NFD Fire Station #1 in September 2005. Despite the fact that the fire stations through which Stuart rotated were heavily male, Stuart testified that she got along well at these stations and peacefully shared common sleeping, shower, and locker room areas with men without incident. At all relevant times following her permanent assignment, Stuart was the only female employee assigned to Fire Station #1.

As indicated, firefighters, because they work 24-hour shifts, require different amenities than those that might be found in an ordinary workplace, including areas to change clothes, sleep, and shower. For its part, Fire Station #1 had a single large locker room, with a bathroom and shower facility attached, and there were no separate facilities for males and females. Attached to this large locker room was the main dormitory, which the firefighters used for sleeping. Fire Station #1 also had a separate private area designated for the two shift captains, which was comprised of two private rooms (with six lockers in each room) connected by a private bathroom and shower facility.

Stuart's arrival at Fire Station # 1 raised privacy concerns for all firefighters, as the nature of the 24-hour shift required that the firefighters often shower and change at work. As Stuart and her captain/supervisor, John Allison, testified, the parties initially attempted to deal with these issues informally, with Stuart volunteering to use the more private shower in the captain's quarters, when it was available, and the public restroom for other needs. As to using a locker, the original, informal plan called for Stuart's locker to be in the general locker room and for Stuart (and her male peers) to "knock and wait" before entering the locker room, to ensure that a member of the opposite sex had an opportunity to "cover up" before the person knocking would enter.

However, this aspect of the plan was not successful as Stuart's male colleagues lodged a series of complaints with their superiors that Stuart was not adhering to the "knock and wait" rules before entering the locker/shower facility. Stuart testified that the fact that male firefighters were permitted to come to work in their street clothes (which is, according to Stuart, not generally allowed) resulted in more changing in the locker room than one might expect, and, therefore, an inordinate number of awkward encounters between Stuart and her male peers, and, also, more formal complaints.

Either way, after receiving a series of complaints from Stuart's male peers that Stuart was not respecting the "knock and wait" rules, management at Fire Station #1 decided a formal policy needed to be put into place. After several rounds of unproductive internal discussions and conversations with the plaintiff about the problem, on October 31, 2005, NFD instituted a temporary policy "to insure privacy for personnel of both genders relative to sleeping, changing of clothes, use of restrooms, and showering." (Docket No. 56 Ex. 1 at 131.) Under this policy, the large locker/shower facility was essentially designated male only and off limits to females, that is, Stuart. (*Id.*) For Stuart, her locker was moved to Allison's bedroom, and females were now required to shower in the bathroom/shower area previously shared by the captains and use either that bathroom or the public facility. (*Id.*) That is, Stuart was required to share her changing space and locker area with Allison, who still used the area as his private bedroom. The policy did require that the captains "insure prompt access" to the new changing and locker area for females. (*Id.*)

Additionally, female employees and the captains were required to follow a "knock and call out" protocol (similar to that previously attempted with the large locker area) before entering

3

either the captains' bathroom/shower area or the changing area/captain's quarters. (*Id.*) Male non-captains were permitted to enter the captains' area to clean it, but, as indicated above, females such as Stuart were not permitted to enter the large locker/shower facility unless specifically directed, in order to, as stated in the memo announcing the temporary policy, "insure maximum privacy to our male personnel." (*Id.*)

As the testimony at trial indicated, the temporary policy caused significant difficulties for Stuart. For instance, Stuart testified that there were times when she needed or strongly desired to go to her locker but she did not because, logically, she was afraid of waking or disturbing her boss. She testified that, on a regular basis, the captains' bathroom would be locked when she wanted to use it, and, therefore, she frequently used the public bathroom, which made her feel like a "child." Despite these difficulties, the temporary policy was made permanent on December 1, 2005, with the key alteration that the two captains on a given shift were required to share a quarters, so that the captain's quarters that had previously also been where Stuart's locker and changing space was located became the designated female locker room. (Docket No. 141 at 6.)

After filing her *pro se* Complaint on October 16, 2006, the plaintiff retained counsel, and, on December 10, 2007, filed an Amended Complaint, asserting violations of Section 1983, Title VII, and the Tennessee Human Rights Act (THRA). (Docket No. 49.) Thereafter, Metro filed a Motion for Summary Judgment, which this court denied in part, allowing Stuart's Title VII and THRA "claims that she was subject to disparate treatment on the basis of gender with respect to the locker, restroom, and shower facilities at Fire Station No. 1" to move forward and dismissing her other claims. (Docket No. 73.)

4

This case went to trial on October 20, 2009. After more than two days of testimony, on October 22, 2009, the jury returned a verdict in favor of the plaintiff. Specifically, the jury found that Metro NFD "intentionally discriminate[d] against the plaintiff [] on the basis of her gender with respect to locker, restroom, and shower facilities at Fire Station No. 1." (Docket No. 134.) Following additional testimony as to damages, the jury awarded Stuart $44,000 in compensatory damages. (Docket No. 136.)

## ANALYSIS

Following the adverse jury verdict at trial, the defendant has renewed its motion for judgment as a matter of law under Fed. R. Civ. 50(b), or, as alternative relief, the defendant has moved for a new trial under Fed. R. Civ. P 59(a). In support of these motions, the defendant argues that the jury's verdict was not supported by the evidence and that a pair of jury instructions that the court declined to provide should have been given. The defendant has also filed a motion requesting that the court review a relatively small portion of the costs that were awarded to the plaintiff by the Clerk of the Court. The plaintiff has filed a motion for attorneys' fees.

### I.  Standards of Review (Post Trial Motions)

#### A.  Rule 50(b)

A motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) may only be granted where, in viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains for the jury, and all reasonable minds would necessarily find in favor of the moving party. *Gray v. Toshiba Am. Consumer Prods.,*

5

*Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). That is, here, viewing the evidence in the light most favorable to the plaintiff, the defendant must show that the evidence in its favor was so overwhelming that no reasonable factfinder could find in favor of the plaintiff. *Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 1269 (6th Cir. 2000).

### B. Rule 59(a)

While a new trial can be ordered for a wide variety of reasons, generally, a court may grant a new trial under Fed. R. Civ. P. 59(a) "if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or otherwise unfair to the moving party." *Conte v. Gen. Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000). The burden of demonstrating the necessity of a new trial is on the moving party, and the ultimate decision whether to grant such relief is a matter vested within the sound discretion of the district court. *Clarksville-Montgomery Co. Sch. Sys. v. U.S. Gypsum Co.*, 925 F.2d 993, 1002 (6th Cir. 1991).

Here, based on the defendant's briefing, the relevant considerations are: (1) whether the verdict was against the weight of the evidence and (2) whether certain jury instructions should have been given. In deciding a motion for a new trial based on the proposition that the verdict is against the weight of the evidence, a trial court may compare and weigh the opposing evidence. *Conte*, 215 F.3d at 637. It may not, however, set aside a jury's verdict simply because the court might have reached a different conclusion or might have drawn different inferences; the jury's verdict should be accepted if it "could reasonably have been reached." *Id.*

Second, a district court's refusal to give a jury instruction constitutes reversible error if: "(1) the omitted instruction [is] a correct statement of the law; (2) the instruction is not

6

substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the requesting party's theory of the case." *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997). Post-trial relief based upon omitted jury instruction(s) is proper if the jury instructions, taken as a whole, were "misleading" without the requested instruction(s). *See id.*

## II.     Metro's Arguments

It is clear from the facts and the legal standards discussed above that, if the court finds that the evidence presented at trial reasonably supported the jury's verdict and that the jury instructions were appropriate, then the defendant's motion should be denied. Therefore, the court will consider Metro's arguments about the weight of the evidence and the jury instructions in turn.

### A.     Weight of the Evidence

The plaintiff attempted to establish her Title VII/THRA claim through the presentation of indirect proof of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. (*See* Docket No. 132 at 14.) Here, the jury was properly instructed that, to establish her *prima facie* case of gender discrimination, the plaintiff needed to demonstrate that: "(1) she is a member of a protected class; (2) she was subjected to an 'adverse employment action'; (3) she was otherwise qualified for her position; and (4) she was treated less favorably than other 'similar situated' employees outside the protected class." (*Id*); *see also McClain v. NW. Cmty. Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 332 (6th Cir. 2006).

The jury was further instructed that, if it found that the plaintiff had established each

7

element of the *prima facie* case by a preponderance of the evidence, the burden would shift to the defendant to present a legitimate, non-discriminatory reason for its actions. (Docket No. 132 at 14-15); *see also McClain*, 440 F.3d at 332. Finally, the jury was instructed that, if they found that the defendant had met this obligation, the burden would then shift back to the plaintiff to demonstrate, by a preponderance of the evidence, that the explanation offered by the defendant was a pretext for discrimination. (*Id.* at 17); *see also McClain*, 440 F.3d at 332.

While not disputing that the jury was properly instructed that the plaintiff is a member of a protected class (females), was "otherwise qualified" for her position, or that her male non-officer peers were "similarly situated," Metro contends that the jury's implicit conclusions that (1) the plaintiff was subjected to an "adverse employment action" and (2) that she was treated less favorably than her similarly-situated peers are not supportable by the evidence. (Docket No. 141 at 3-7.) Moreover, Metro contends that "[t]here was no legally sufficient basis for the jury to conclude that [Metro's] legitimate nondiscriminatory reasons for its allocation of restroom, locker and shower facilities at Station No. 1 were a pretext for unlawful discrimination." (*Id.* at 7.) The court will consider each of Metro's arguments in turn.

### i. "Adverse employment action"

Metro argues that "there was no evidence that the restroom, locker, and shower facilities provided to Ms. Stuart at Station 1 were materially adverse." (Docket No. 141 at 3.) As the jury was properly instructed, "[a]n 'adverse employment action' means something more than a decision that the plaintiff does not like, a mere inconvenience, or a trivial benefit given to someone else. To prove that she experienced an adverse employment action for the purposes of her discrimination claim, the plaintiff must show that there was a materially adverse change in

8

the terms and conditions of her employment." (Docket No. 132 at 14.); *see also Mitchell v. Vanderbilt University*, 389 F.3d 177, 182 (6th Cir. 2004). Plainly, whether an employment action is "materially adverse" is a fact-specific inquiry that depends on all of the circumstances of the individual case. *See Brennan v. Tractor Supply Co.*, 237 Fed. Appx. 9, 24 (6th Cir. 2007).

Metro contends that the facts of this case do not present evidence of a "materially adverse employment action," that is, "simply having to share a restroom with someone of the opposite gender, by itself, is not a materially adverse change in the terms and conditions of employment." (Docket No. 141 at 4.) Metro points out that there is no evidence that the bathroom to which Stuart was assigned was "in poor condition or unsanitary" or any evidence that, at any point, Stuart was prohibited from using the bathroom, locker room, or shower. (*Id.*) While Metro recognizes that the temporary privacy policy did result in Stuart's locker being placed in Allison's bedroom, Metro argues that this action cannot be considered materially adverse, in large part, because this arrangement only lasted for one month. (*Id.* at 4-5)(citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000)(finding that a ten-day removal of an individual from his position was "very temporary," *de minimis*, and, therefore, not actionable as a materially adverse employment action). At most, Metro claims that Stuart's reassignment was an "inconvenience," and, under the standard discussed above, not actionable.

The court finds that, under the circumstances of this case, there was sufficient evidence by which a reasonable jury could have concluded that the plaintiff's reassignment constituted a materially adverse employment action. Prior to the temporary policy being put into place, Stuart, while accounting for privacy, was allowed to use the same spaces that her peers did, and

9

she was able to address the basic needs of the job without unreasonable restriction.

However, under the new policy, temporary or permanent, the plaintiff lost much of this benefit. Indeed, the plaintiff was explicitly prohibited from using an area of the workplace that she was previously permitted to use and that everybody else at the station was allowed to continue to use; she was essentially cordoned off from the rest of the "team." Moreover, particularly under the temporary policy, she could no longer address her basic needs at her convenience. Indeed, as the plaintiff testified, while the temporary policy was in place, she could not access her locker at her convenience but rather had to work around her captain's sleeping schedule. Moreover, the institution of the permanent policy did not correct all of the problem, as she could still not access a major section of the workplace that she had previously been allowed to use and still had to potentially wait for her captain to finish using the (frequently locked) private bathroom before she could use it.

In sum, a reasonable jury could find, under the facts of this particular case, that the plaintiff's reassignment was "materially adverse" because it, in essence, changed the plaintiff's status from being "one of the team" to being a "problem" to be dealt with. The adversity presented by this development is particularly acute, given the communal nature and the demands of the firehouse environment. That is, whereas before the plaintiff was permitted to use the same areas everyone else was, after the new policy was instituted, she was restricted in terms of where she could go and limited in the ways that she could use the services vital to someone in her line of work. (*See* Docket No. 72 at 11) ("a firefighter's job requires him or her 'to move and work efficiently . . . , to quickly change in and out of gear, [and] to shower for health reasons,' all of which renders adequate facilities an integral term and condition of a firefighter's

10

employment.")(citing and quoting *Wedow v. City of Kan. City, Mo.*, 442 F.3d 661, 672 (8th Cir. 2006)). As a reasonable jury could conclude that this situation significantly exceeded a "mere inconvenience" or a "trivial" benefit reduction, Metro is not entitled to post-trial relief based on the argument that the plaintiff did not suffer a "materially adverse employment action."

### ii. Less favorable treatment

Metro also contends that there was insufficient evidence that the plaintiff was treated less favorably than other 'similar-situated' employees outside of her protected class, that is, "there was no evidence" that the male firefighters at Station # 1 "received better restroom, locker, and shower facilities than Ms. Stuart." (Docket No. 141 at 5.) Indeed, Metro argues that the evidence established that the facilities to which Stuart was assigned were as nice or nicer than the facilities she had been using. (*Id.*) Moreover, Metro claims that males never had better access to facilities because Stuart was never explicitly denied access to a locker, shower, or bathroom. (*Id.* at 5-6.)

Metro, as it did in summary judgment briefing, "completely misses the point." (Docket No. 72 at 11.) A reasonable jury could easily conclude that the plaintiff was treated less favorably than her similarly-situated male peers. Indeed, every male was permitted to use the large locker/shower area, including the captains. The plaintiff was the only employee that could not access that area. (Docket No. 148 at 6.) Relatedly, under the new policies, the plaintiff was the only employee that was forced to share changing, shower, and bathroom space with members of the opposite sex. (*Id.*) Also, the plaintiff was the only person who was restricted from accessing a portion of the workplace; indeed, her male peers were free to enter the captains' area/female locker room to "clean," but the plaintiff was not allowed to enter the large

11

locker/shower area, and this was in order to "insure maximum privacy to [Metro's] male personnel." (Docket No. 56 Ex. 1 at 131.) Therefore, the policy guaranteed the plaintiff's similarly-situated male peers a level of privacy and comfort that the plaintiff could not expect. For these reasons, Metro is not entitled to post-trial relief based upon the argument that the plaintiff was treated no differently than similar-situated male employees.

### iii. Failure to show pretext

Metro contends that, at trial, it "offered multiple legitimate nondiscriminatory reasons for its allocation of locker, restroom, and shower facilities at Station No. 1." (Docket No. 141 at 7.) Metro claims that Fire Station # 1 was built "when firefighting was a male-dominated profession," that "budgetary and response time limitations" precluded "separate accommodations," and that it was only "necessary to implement formal privacy policies" because Stuart did not abide by the "knock and wait" rule. (*Id*.) Metro also claims that the evidence demonstrated that "other influences," such as union opposition, prevented a more timely establishment of a "designated female locker room." (*Id.*)

As the jury was properly instructed, even in light of the defendant's explanations, it could still find for the plaintiff if it found, by a preponderance of the evidence, "that the stated reasons were not the true reasons but were only a pretext or excuse for discriminating against the plaintiff because of her gender." (Docket No. 132 at 17); *see also McClain*, 440 F.3d at 332. In establishing this case, the plaintiff may put forth evidence that the purported explanation (1) had no basis in fact; (2) did not actually motivate the defendant's conduct; or (3) is insufficient to warrant the challenged conduct. (*Id.* at 18)*; see also McClain*, 440 F.3d at 332. Under the facts of this case, a reasonable jury could have rejected the defendant's explanation as insufficient and

12

pretextual.

Indeed, Metro has come forward with an explanation for why it was placed in a difficult situation by the design of the firehouse, economics, and union opposition. That said, none of the excuses directly justifies why the policy completely protected the privacy of the male firefighters, providing all male firefighters with the benefit of the original locker/shower room, while subjecting the plaintiff to sharing a facility with her male bosses. Additionally, while Metro offers these explanations now, it cannot escape the plain language of the policy, which permitted the plaintiff's male peers to access the captains' area to "clean" but stated that the plaintiff was not permitted to access the main locker/shower room to "insure maximum privacy to our male personnel." (Docket No. 56 Ex. 1 at 131.)

The jury instructions properly stated that "the ultimate issue" for the jury to decide was whether "gender actually motivated [Metro] to take an adverse employment action" against the plaintiff. (Docket No. 132 at 18.) Considering the plain language of the policy itself, the liberties provided to males that were not provided to the plaintiff, and the fact that the policies were only instituted after males started complaining, a reasonable jury could conclude that gender discrimination motivated the employment decision here, and, therefore, Metro's argument fails.

### B. Jury Instructions

Metro contends that it is entitled to post-trial relief because the court failed to provide two instructions. (Docket No. 141 at 8-11.) Specifically, Metro argues that the court should

13

have provided a more detailed instruction as to what constitutes an "adverse employment action" and, also, that Metro was entitled to a "same actor inference" instruction. (*Id.*)

### i. Adverse employment action instruction

Metro claims that, in addition to providing a definition of "adverse employment action," the court should have provided examples of adverse employment actions for the jury. (*Id.* at 8.) Metro points to a Northern District of Florida decision in which the district court referred to terms such as "adverse employment action" as terms that required "adequate definitions" during jury instructions because "jurors [do not] use [such terms] in daily conversation." Metro also points to pattern jury instructions from the First and Seventh Circuits in which specific examples of adverse employment actions (such as termination or demotion) are provided. (*Id.* at 9-10)(citing *Redding v. Fla. Dept. of Juvenile Justice*, 401 F. Supp. 2d 1255, 1258 (N.D. Fla. 2005)). Metro contends that, without examples, the jury did not have a context for the meaning of "adverse employment action," and, therefore, was more likely to err in determining that such an action was taken in this case. (*Id.* at 10.)

As discussed above, the inquiry into whether an "adverse employment action" occurred is highly fact-specific and circumstantially dependent. *See Brennan*, 237 Fed. Appx. at 24. While adding a non-exhaustive list of potential adverse employment actions would not necessarily result in an incorrect statement of the law, it could well serve to confuse the jury more than the court's approach, which, contrary to Metro's argument, did provide context to the term, accurately stating that an "adverse employment action" is "something more than a decision that the plaintiff does not like, a mere inconvenience, or a trivial benefit given to someone else." (Docket No. 132 at 14.); *see also Brennan*, 237 Fed. Appx. at 24.

14

Indeed, because an act that constitutes an "adverse employment action" in one set of circumstances might not rise to that level in another set of circumstances, there is a clear risk that, by providing specific examples, the circumstantially dependent nature of the inquiry might be lost. Therefore, applying the standard discussed above, the court concludes that, in essence, the refused instruction was "substantially covered by other delivered charges," and, therefore, Metro is not entitled to post-trial relief on this ground. *Sutkiewicz*, 110 F.3d at 361. .

### ii. Same actor inference

Metro also contends that the court erred in prohibiting Metro from offering evidence into its "aggressive" efforts to recruit female firefighters and, relatedly, erred in not allowing that evidence to be combined with a jury instruction on the same actor inference. (Docket No. 141 at 10.) The "same actor inference," as originally defined by the Sixth Circuit, allows the jury to "infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Trans. Co.*, 61 F.3d 461, 463 (6th Cir. 1995). The Sixth Circuit has since clarified that this inference is not "mandatory," and, from the case law that the court can locate, this inference is applied only in the narrow circumstance in which the same individual both hired and fired the employee. *See e.g. Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003).

Here, the plaintiff was not fired, and, therefore, on the case law provided by the parties, the same actor inference should not apply. Moreover, even if there was case law support for extending the "same actor inference" outside of the hiring/firing context, it is not clear that the plaintiff was hired and then subjected to the adverse employment action by precisely the same person. As the "same actor inference" does not apply here, there was no error in excluding the

15

evidence designed to support that inference.

**III.   Attorneys' Fees**

On November 18, 2009, the plaintiff filed a Motion for Attorney Fees. (Docket No. 143.) Metro has not responded to this motion. Attached to the motion and brief are the affidavits of plaintiff's counsel, Mr. Knox and Mr. Castelli, which assert that they worked 130.6 and 59.0 hours on this matter, respectively, at an hourly rate of $200 per hour. (Docket Nos. 145 and 146.) Therefore, counsel asserts that it incurred $37,920 in fees. (*Id.*) (189.6 multiplied by 200 is 37,920). Also, attached to each affidavit are counsel's detailed billing records, indicating each action that counsel took in this case and the time spent thereon. (*Id.*) Moreover, the plaintiff submitted the affidavit of R. Steven Waldron, a long-time employment discrimination lawyer located in Murfreesboro, Tennessee, who asserts that he is familiar with this case from a procedural and substantive perspective and that the hourly rate and time spent by counsel are reasonable under the circumstances. (Docket No. 147.)

Both Title VII and the THRA permit the prevailing party in an employment discrimination suit to recover attorneys' fees. *See* 42 U.S.C. § 2000e-5(k)(a court "in its discretion" may award "a reasonable attorney's fee" to the prevailing party); T.C.A. § 4-21-306(7) (allowing recovery of "reasonable attorney's fee" as part of the damages caused by a discriminatory practice). To qualify as a "prevailing party," a plaintiff in a discrimination case must "obtain at least some relief on the merits," which the plaintiff clearly did here. *Farrar v. Hobby*, 506 U.S. 103, 111 (1992).

The Sixth Circuit has recognized that the plaintiff's method of calculating the fee here (known as the "lodestar method" – number of hours worked multiplied by hourly rate) is an

16

appropriate way to calculate the attorneys' fee in a Title VII action. *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). While there are many potential factors that can be considered in assessing whether the requested fee is reasonable, the "most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Id* at 416. (internal quotation omitted). Where the plaintiff's counsel has achieved "excellent" results, he is entitled to a "full compensatory fee," and the achievement of an "excellent" result does not require success on all claims. *Id.* Indeed, where the plaintiff has been successful, a departure from this fully compensatory amount should only be considered in "rare and exceptional cases" where specific evidence supports a departure. *Id.*

Here, from the billing records, the affidavits, and Metro's failure to object to the plaintiff's fee request, there is every indication that the time spent by counsel was reasonable under the circumstances and that the hourly rate was reasonable as well. Additionally, while the plaintiff was not successful on every claim asserted in the Complaint, the plaintiff achieved "excellent" results, in that the jury found in her favor on the key issue in the case, that is, whether Metro discriminated against her through its policies. Therefore, the court will award the plaintiff the requested amount, that is, $37,920, which is most reasonable.

## IV. Motion for Review of Costs

On November 16, 2009, the plaintiff, as prevailing party under Fed. R. Civ. P. 54(d), submitted its Bill of Costs to the Clerk of Court, seeking $350 in filing fees, $1,265.20 in transcript and court reporter fees, and $320 in legal assistant time. (Docket No. 142.) Attached to the submission was the affidavit of Allyson Hornsby, legal assistant, who stated that she provided eight hours of assistance to plaintiff's counsel on the day before trial, at the market rate

17

of $40 per hour. (Docket No. 142 Ex. 1.) Specifically, Ms. Hornsby stated that she "copied, organized, and prepared" the trial materials used in this case. (*Id.*) As there was apparently no objection from Metro to the Bill of Costs submission, the Clerk of Court, pursuant to Fed. R. Civ. P. 54(d) and the Local Rules, awarded the costs on December 1, 2009. *See* L.R. 54.01.

On December 3, 2009, Metro filed its Motion for Review, requesting that the court review the Bill of Costs and reduce the cost award by $320, because "legal assistant time" is not a recoverable cost under Rule 54(d). (Docket No. 150 at 2.) As Metro correctly argues, the Rule 54(d) allowable costs are enumerated in 28 U.S.C. § 1920, and "legal assistant time" is not enumerated as an allowable cost in that statute. (*Id.*)(citing 28 U.S.C. § 1920 and Fed. R. Civ. P 54(d)). Therefore, Metro argues, the legal assistant time should not be recoverable.

In response, the plaintiff argues that Metro waived its right to object to the Bill of Costs by not filing an objection with the Clerk of the Court before those costs were assessed by the Clerk. (Docket No. 151 at 1.) However, the Local Rule does not require Metro to object with the Clerk of the Court prior to filing a Motion for Review. L.R. 54.01. Perhaps recognizing the problem, the plaintiff, alternatively, seeks to have the $320 included in the attorneys' fee award. (Docket No. 152 at 2.)

Legal assistant time is generally recoverable by the prevailing plaintiff in a civil rights action, with the caveat that "purely clerical or secretarial tasks" may not be billed at the standard paralegal rate. *Kadri v. Johnson*, 2005 WL 3454330, *5 (W.D. Tenn. Dec. 16, 2005); *Jorling v. Habilitation Servs., Inc.*, 2005 WL 1657060, *12 (S.D. Ohio July 14, 2005)(noting that the time of "an attorney, paralegal, [and] legal assistant . . . fall[] within the rubric of 'attorney fees' for purposes of the fee-shifting statutes."). In its reply briefing on this issue, Metro contends that it

18

is clear from Hornsby's affidavit that she was performing "clerical tasks," and, therefore, the $320 is not recoverable. (Docket No. 153 Ex. A. at 3.) That is not how the court reads Hornsby's affidavit, however. Rather, from her affidavit, it is reasonably clear that Hornsby was organizing and preparing materials for trial, a task that, as Metro well knows, goes well beyond that of the "purely clerical." Therefore, the $320 is recoverable as part of the attorneys' fee in this case. The final attorneys' fee award will be $38,240, with the costs recovery reduced to $1,615.20.

## **CONCLUSION**

For the reasons discussed herein, Metro's motion for post-trial relief will be denied, the plaintiff's Motion for Attorney Fees will be granted, and Metro's Motion for Review will be denied (that is, the court will still allow for the recovery of legal assistant fees). The court will reduce the costs award to $1,615.20 but will award attorney's fees of $38,240.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge